IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 5, 2009 Session

**STATE OF TENNESSEE v. SHAIRIQ SEABROOKS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00034      Paula Skahan, Judge**

---

**No. W2008-00443-CCA-R3-CD  - Filed September 29, 2009**

---

The defendant, Shairiq Seabrooks, was indicted on charges of first degree felony murder and first degree murder. After a jury trial, the trial court granted the defendant's motion for judgment of acquittal as to the felony murder charge and the charge of first degree murder remained.  The jury convicted the defendant of the lesser-included offense of second degree murder and the defendant was sentenced as a standard Range I offender to serve twenty-two years in the Tennessee Department of Correction.  The defendant has appealed, raising the following issues: (1) whether the evidence was sufficient to support his conviction of second degree murder; (2) whether the trial court erred in excluding testimony regarding the victim's prior arrest for the unlawful possession of a weapon; (3) whether the trial court erred in excluding testimony as inadmissible hearsay; (4) whether the jury charge concerning reasonable doubt was unconstitutional; and (5) whether the court erred in charging the jury on second degree murder.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MᴄLɪɴ, J., delivered the opinion of the court, in which Tʜᴏᴍᴀs T. Wᴏᴏᴅᴀʟʟ and Cᴀᴍɪʟʟᴇ R. MᴄMᴜʟʟᴇɴ, JJ., joined.

Larry E. Copeland, Jr. (on appeal and at trial), Joseph S. Ozment (on appeal), and Sean H. Muizers, (at trial), Memphis, Tennessee, for the appellant, Shairiq Seabrooks.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dean Decandia and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Background

The Shelby County Grand Jury returned an indictment charging the defendant with first degree felony murder and first degree murder of Ozell Faulkner.  A jury trial was held on the charges against the defendant.  We summarize the pertinent evidence presented at trial as follows. Constance

Coleman identified the victim, Ozell Faulkner, as her son. She confirmed that he was also known as Ozell Jordan. Ms. Coleman stated that in December of 2005, the victim was twenty-one years old and lived with her on Pope Street, near Mitchell's Grocery Store.

Delvin Jones testified that the victim was his cousin. At the time of the shooting, Mr. Jones and the victim spent a lot of time together in the area of Memphis where the victim lived with his mother. He said that they went to Mitchell's Grocery almost every day. At approximately eight o'clock p.m. on December 3, 2005, Mr. Jones met the victim on Mount Olive Street and they walked to his mother's house where the victim used the telephone. They then walked to "Candyman Joe's" house to buy cigarettes and then to Mitchell's Grocery. Mr. Jones stated that while he was at the store he saw "David Bibbs, Michael Smith, [and] Peanut." Mr. Jones explained that "Peanut" was the defendant's nickname. Mr. Jones said that he had seen the defendant around the neighborhood and only knew him by his nickname. According to Mr. Jones, Mr. Bibbs, Mr. Smith and the defendant were members of the Bloods gang and were wearing red clothes on the night of the shooting. The defendant had the initials "CK" tattooed on his face. Mr. Jones explained that "CK" meant "Crip Killer."

After Mr. Jones bought cigarettes, he and the victim left the store, but they remained outside. The defendant, Mr. Bibbs, and Mr. Smith followed them out of the store and the defendant approached the victim and asked "[w]here the birds at?" As the defendant stood in front of the victim, he held a beer in his right hand and held his side with his left hand. Mr. Jones said that the victim asked the defendant what he meant and the defendant "just walked off." The defendant, Mr. Bibbs, and Mr. Smith headed down Chelsea Street, but they returned to the store about fifteen minutes later. The defendant walked up to the victim and stood in front of him holding his side with his right hand and holding the bottom of his coat with his left hand. Mr. Smith and Mr. Bibbs stood on each side of the defendant. The defendant asked the victim "where it's at?" Mr. Jones said that the victim "just started laughing at him" and the defendant pulled a twelve gauge sawed off shotgun out of his coat and shot the victim. Mr. Jones ran into the store and "told Ms. Sarah [Mitchell] to call the police." As he was running into the store, Mr. Jones heard two or three more shots, but does not know what gun was used. After he asked Sarah Mitchell to call the police, Mr. Jones returned to the victim and a crowd of people had started to gather at the scene. He remained with the victim until the paramedics arrived. Mr. Jones said that nothing was taken from or left at the scene while he waited for the police.

On the night of the shooting, Mr. Jones was brought to the police station where he gave a statement. The police showed him photospread sheets and he identified Mr. Smith on one of the sheets and wrote on the sheet, "Mike Smith[,] he was the person that I saw at the shooting with Peanut." Mr. Jones also identified Mr. Bibbs on a photospread sheet and wrote on the sheet, "[t]his was the person with Peanut." On the following day, Mr. Jones identified the defendant as "Peanut" on a photospread sheet.

Mr. Jones stated he was unaware of any gang involvement by the victim and denied that he was in a gang. He further denied that the victim was armed or had given the impression that he had a weapon while they were at Mitchell's Grocery. He stated that the victim did not threaten the defendant. On cross-examination, Mr. Jones testified that the area "was a gang neighborhood" with

an even split of Crips and Bloods. Regarding his statement to police that the victim was a Crip, Mr. Jones stated that the victim "used to be around" the Crips, but he claimed that he did not know that the victim was a gang member.

Sarah Mitchell, the owner of Mitchell's Grocery, testified that at eight o'clock p.m. on December 3, 2005, the victim came in the store and asked for a cheeseburger. Ms. Mitchell told him the kitchen was closed and he left the store. Three or four minutes after the victim left, she heard one shot outside and she ran towards the back of the store. Ms. Mitchell stated that she "heard some shots, and when [she] came back out and headed back to the front [Mr. Jones] met [her] coming in the door and told [her] to call 9-1-1[.]" She stated that Mr. Jones was not armed. On cross-examination, Ms. Mitchell stated that the victim came in the store only one time that day, right before the shooting.

Officer Tyont Shabazz with the Memphis Police Department testified that on December 3, 2005, he went to Mitchell's Grocery Store in response to a "shot fired, man down" call. Officer Shabazz stated that when he and his partner arrived to secure the scene, they found the victim of the shooting lying on the ground in a pool of blood and unconscious. Officer Shabazz did not see any weapons near the victim nor did he notice anyone at the scene wearing gang colors. Officer Shabazz stated that his report indicated that "Mr. D. Jones" came forward as a witness and provided information about the shooting.

Gary Gordon, EMT with the Memphis Fire Department, testified that on December 3, 2005, he responded to a call reporting a gunshot victim at Mitchell's Grocery. Mr. Gordon accompanied a paramedic to the scene where they found a "young African-American male lying on the ground with a gunshot wound." Mr. Gordon rolled the victim over and placed "his intestines . . . back on his stomach" so they could load him into the ambulance. He stated that he did not observe any weapons around the victim. On cross-examination, Mr. Gordon stated that eight minutes passed from the initial call until they arrived on the scene.

Officer Delmar Wells with the Memphis Police Department testified that he collected evidence from the crime scene. Officer Wells stated that he photographed the scene and tagged two piles of clothing found at the scene that appeared to be wet with blood. Officer Wells identified a photograph of a blue jacket and a blue and white shirt soiled with what appeared to be blood. As part of his investigation, Officer Wells searched a dumpster located next to Mitchell's Grocery and the area around the store, but he did not find a weapon. On cross-examination, Officer Wells reviewed his report and stated that he tagged other clothing stained with what appeared to be blood. He identified a photograph that he took of the area around the store and stated the photograph depicted two areas on the ground that appeared to be wet. He agreed that the photograph did not indicate that there was anything on the ground by the corner of the store.

Hersell Seabrooks testified that the defendant was her nephew. Ms. Seabrooks stated that she lived in Gainesville, Florida. She said that years ago, the defendant lived with her family in Florida for a short period of time, but Ms. Seabrooks' mother sent him back to Tennessee. On December 14, 2005, Ms. Seabrooks contacted the sheriff's department to request information on a

warrant that had been issued on the defendant. She found the defendant's belongings at her mother's house and found the defendant down the street from her mother's residence. Ms. Seabrooks stated she took the defendant to her house and called the sheriff's department. Officers came to her home and arrested the defendant.

Officer William Merritt with the Memphis Police Department testified that on December 27, 2005, he accompanied the case officer, Sergeant Justice, to a jail in Florida to retrieve the defendant. Officer Merritt stated that the defendant was advised of his *Miranda* rights, and that he voluntarily made a statement. Referring to the defendant's statement, Officer Merritt testified that the defendant:

> told us that he had been threatened or been involved in some type of feud with [the victim] and other people that [the victim] knew. He told us that the day the shooting occurred that he had gone up to the store where the shooting occurred on Chelsea earlier in the afternoon, and when he was up there he noticed [the victim] and people that [the victim] knew up there.
>
> He felt uncomfortable because he left the store after making a purchase and went about his way. [The defendant] [t]old us later on that evening he went back up to the store once night fell, once again he saw [the victim] up there, and as he came out of the store [the victim] and some other people that were with him appeared like they were going for weapons and when that happened [the defendant] told us he pulled his weapon and fired.

Officer Merritt stated that the defendant took "[f]ull responsibility" for the shooting. The statement also included the defendant's claim that:

> for about a month prior to this time, [the victim's] partners pistol played [him]. [The defendant would] be standing on Pope Street and they would repeatedly walk past [the defendant] and showed [him] guns and would have word out telling others that [he] was a dead man walking.

The defendant stated he did not know the names of the others but knew "they were Crips" and that he saw "pistol prints" in the victim's pockets. He claimed that whenever he saw the victim, he would grab his pistol to make the defendant "aware that he had one."

Dr. Kenneth Snell, a forensic medical examiner, testified that he performed an autopsy on the victim's body and identified a photograph taken of the victim's head. He described the victim as a twenty-one year old African-American male with a height of sixty-six inches and weighing 116 pounds. The victim had received medical treatment before his death and had a one-forth inch diameter circular hole in the midline of his abdomen with a small rim of abrasions and smaller bruising around the abrasions. The wound in the abdomen was consistent with an entrance gunshot wound created by a shotgun. In his autopsy report, Dr. Snell identified injury to the large and small intestines and to the iliac artery and vein. Dr. Snell stated that shotgun wadding and pellets were recovered from the area of the shotgun wound. The victim also had a second, smaller wound to his

right mid-back consistent with an entrance gunshot wound. Dr. Snell stated that a medium caliber copper jacked projectile was recovered from the second wound. He testified that in his opinion, the cause of the victims death was a shotgun wound to the abdomen. Dr. Snell estimated that at the time of the shooting, the distance from the victim's body to the end of the barrel of the shotgun was three to four feet. On cross-examination, Dr. Snell explained that the second wound had an upward trajectory consistent with a shot from a handgun held by someone located to the victim's left.

Sergeant Connie Justice with the Memphis Police Department testified that she was the case coordinator in this investigation. She testified that she took the defendant's statement regarding the evidence, Sergeant Justice testified that she "submitt[ed] the evidence, the bullets or the fragments and buckshot . . .obtained out of the body of the victim, and took them to [the Tennessee Bureau of Investigation] and requested testing on those items." On cross-examination, Sergeant Justice said the defendant "mentioned something about David [Bibbs] being young and sometimes young kids get in trouble, and that [the defendant] didn't want that to happen [to] David Bibbs so that he was going to take all the blame." She stated that her investigation indicated that more than one gun was at the crime scene. In addition to the shotgun pellets and shotgun wadding, there was a bullet fragment from a separate weapon found in the body of the victim. The Tennessee Bureau of Investigation (TBI) reported that the bullet fragment obtained from the victim's body appeared to have been from a .38 caliber gun. Sergeant Justice confirmed that a supplement to the investigation report indicated that a witness stated that "after the victim had been shot and was lying on the ground . . . other people had guns[.]" Alex Brodhag, a firearm's examiner with the TBI, examined the evidence that was recovered from the victim and identified a ".38 caliber class bullet," shot wads from a 12 gauge shot shell, and nine pellets of buckshot from a shotgun shell.

In an offer of proof by defense counsel, Lieutenant Dorothy Hyman with the Memphis Police Department testified regarding her arrest of the victim. Lieutenant Hyman stated that on October 7, 2005, the victim was arrested after having been found in possession of a 306 Winchester Rifle at a residence on Pope Street. A companion arrest was also made in connection with the same incident charging the arrested individual with unlawful possession of a .9 millimeter handgun. The defendant also testified during the offer of proof. He stated that he recognized the address on Pope Street and stated the arrests took place near the house where he was residing at the time of the arrest.

The defendant testified that in 2001, he was attending Craigmont High School and living on Douglas Street in an area known as "Little Chicago." Soon after he moved to the neighborhood, he was approached by members of the Crips' gang and invited to join. The defendant declined the invitation and he was told he would "roll with them or get . . . rolled over." He befriended some members of the Bloods' gang who looked out for him. The defendant said that he later joined the Bloods. In the beginning of 2005, the defendant got his face tattooed with "CK." He explained that "CK" stood for "Crip Killer" but he claimed that he did not "mean any harm when [he] got it . . . [he was] really trying to look cool and fit in." The defendant said that he got along fine with the victim until he got the tattoo. After he got the tattoo, the victim "quit hanging with [the defendant] and . . .[told the defendant] if [he] didn't get the tattoo removed that he was going to shoot it off[.]" The defendant said that the victim continued to threaten him "on a constant basis" and that he agreed to have his tattoo removed. However, the defendant wanted to "get it covered up professionally and that cost a bit of money." According to the defendant, the victim and his partners continued to

harass him and would sometimes threaten him by pulling out guns. He said that they also "threw up gang signs" at him.

The defendant said that at the time of the shooting, he carried a shotgun with him almost all the time and was armed when he entered the store in the afternoon. The defendant returned to Mitchell's Grocery that night. The victim, Mr. Jones, and four other Crips followed him out of the store and "walk[ed] up on [him] as [he] was walking away reaching for guns, and . . .[he] reacted to the situation and defended [himself] by pulling [his gun] . . . . shot one time" and ran. The defendant thought that they "were trying to kill" him and stated that he knew that they had guns because before he entered the store, he saw the "print of the gun but they were holding [it] through the jackets so [he] couldn't describe the gun."

On cross-examination, the defendant stated that he saw Mr. Bibbs in the store before the shooting, but he did not see Michael Smith. The defendant assumed that one of the victim's partners might have shot the victim in the back because they had guns and were standing behind him. He said that he knew that the victim, Mr. Jones, and another guy had guns and that they were reaching for them when he shot. The defendant estimated that the victim was three to four feet from him when he shot. The defendant denied that the reason he came back to the store that day was to confront the victim because he had gotten his dope. He stated that "bird" can refer to cocaine, but he denied asking the victim "where the birds at?" He claimed that he began to carry the shotgun around all the time for protection after he "got jumped on" and his arm was broken with a metal pipe. On redirect examination, the defendant said that Michael Smith had been killed by members of the Crips' gang.

Undrey Murphy testified that on the night of the shooting, he was with Michael Smith at Pope and Mount Olive Streets when they heard five or six gunshots. Mr. Murphy said that a few minutes before he heard the shots, he saw his brother walking in the direction of the store. Upon hearing the shots, Mr. Murphy went with Mr. Smith to Mitchell's Grocery where they saw the victim on the ground with ten to fifteen people gathered around. On cross-examination, Mr. Murphy said that he met up with Mr. Smith earlier in the day. Mr. Murphy said that he was with Mr. Smith at the store at about three o'clock in the afternoon. He said that they talked to some guys outside of the store for about forty-five minutes and then they went to Pope and Mount Olive Streets where they heard the shots. On redirect examination, Mr. Murphy agreed that he was nervous testifying and that it was possible that he and Mr. Smith went to Pope and Mount Olive Streets two times that day. He said that Mr. Smith was now deceased. On recross-examination, Mr. Murphy denied that he was giving incorrect times to try to take Mr. Smith away from the crime scene at the time of the shooting.

Colonious Davis, manager of outpatient operations at the Regional Medical Center (the Med), identified an emergency department record dated November 15, 2005, documenting treatment for the defendant. Mr. Davis stated that the record indicated that the defendant was treated at the Med for a broken arm. On cross-examination, Mr. Davis stated that the record reports that the defendant "complain[ed] of left forearm pain after being hit by a lead pole while in a fight."

After the trial court granted the defendant's motion for judgment of acquittal as to the felony murder charge, the jury was charged and deliberated on the remaining charge of first degree murder.

The jury returned a verdict finding the defendant guilty of second degree murder. The trial court subsequently sentenced the defendant to twenty-two years in the Tennessee Department of Correction. The defendant has appealed.

Analysis

I. Sufficiency of the Evidence

On appeal, the defendant first challenges the sufficiency of the evidence. He asserts that the proof at trial showed that he acted in self-defense and in response to numerous threats by the victim and his friends. The defendant asserts that his testimony established that the victim and his friends reached for their guns and that "he fired his gun and shot because they were trying to kill him." The defendant contends that in light of the parties' gang involvement, the proof was insufficient to support the jury's finding that the defendant intentionally and knowingly killed the victim.

We begin our review by setting forth the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Second degree murder is "[a] knowing killing of another." *See* Tenn. Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "[A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). The claim of self-defense or defense of another is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

After reviewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to support the defendant's conviction of second degree murder. The

evidence established that the defendant was a gang member or that he had been involved with the Bloods and that he had some conflict with the victim who was a Crip. On December 3, 2005, the defendant returned to Mitchell's Grocery where he had seen the victim earlier in the day. The evidence further supported that the defendant knowingly shot and fatally wounded the victim. Although the defendant claimed that the victim was armed, he could not describe the victim's gun. The state presented the testimony of witnesses who said that the victim was not armed at the time of the shooting. No gun was found at the crime scene or on the victim's body. Also, the defendant did not present any evidence to corroborate his testimony of an immediate threat at the crime scene. From the evidence, the jury could have rationally found that the defendant's action in shooting the victim was excessive and unnecessary for self-defense and that the defendant's use of deadly force was not founded on reasonable grounds. As previously noted, the credibility and weight given to a witness' testimony are issues resolved by the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659. The jury, as was their prerogative, chose not to credit the defendant's theory of self-defense, and we will not second-guess the factual determinations of the jury. Accordingly, the defendant is not entitled to relief on this issue.

## II. Evidentiary Rulings

Second, the defendant challenges the trial court's evidentiary rulings excluding evidence of the victim's prior arrest and the unsworn statement of Michael Smith, deceased at the time of the trial. The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court. *Rice*, 184 S.W.3d at 682. With that principle in mind, we review the trial court's evidentiary rulings for abuse of discretion. *Id.; see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Gray*, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997).

### A. Exclusion of Evidence of the Victim's Prior Arrest

The defendant asserts that the trial court erred in excluding the testimony of Lieutenant Hyman regarding the victim's arrest in October of 2005 on charges of unlawful possession of a weapon. The defendant asserts that the testimony showed the victim's "criminal record and propensity or habit of going armed." He asserts that the testimony would have added credibility to the claim of self defense. The defendant argues that the testimony was admissible pursuant to Rule 404(b) and Rule 405(b) of the Tennessee Rules of Evidence. The state asserts that the issue was not raised in the defendant's motion for a new trial and is therefore waived. In addition, the state asserts that the defendant has failed to show that the probative value of evidence of the victim's arrest outweighed its prejudicial effect.

The defendant's motion for a new trial fails to refer to the arrest of the victim on a weapons charge, but instead states as a ground in support of the motion "[t]he Court erred by improperly limiting the Defense's proof in not allowing the introduction of the victim's, Ozell Faulker/Jordan, criminal record into evidence[.]" The record reveals that at a hearing on the motion, defense counsel argued that testimony regarding the victim's arrest on a weapons charge would have lent credibility to the defendant's testimony that the victim was armed and to the theory of self defense. Therefore, we proceed to a review of the trial court's ruling excluding the testimony of Lieutenant Hyman.

Under limited circumstances, "specific violent acts of the victim are admissible to corroborate the defendant's assertion that the victim was the aggressor." *State v. Furlough*, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990), *perm. to app. denied*, (Tenn. 1990); *see also State v. Hill*, 885 S.W.2d 357, 361-62 (Tenn. Crim. App. 1994), *perm. to app. denied* (Tenn. 1994). First aggressor evidence is evidence which would address "the animus of the [victim], his conduct and motives, and [is] offered to show which party began or provoked the fight." *State v. Jerry Dale Bennett*, No. 03C01-9304-CR-00115, 1994 WL 53645, at *3 (Tenn. Crim. App., at Knoxville, Feb. 24, 1994) (quoting *Little v. State*, 65 Tenn. 490, 493 (1873)). "[B]efore a defendant can offer proof of evidence of first aggression . . . [s]elf defense must be at issue by the evidence in the record, not by the words and statements of counsel." *State v. Laterral Jolly*, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App., at Jackson, Dec. 15, 1993), *perm. to app. denied* (Tenn. 1994). Likewise, first aggressor evidence, albeit admissible to corroborate a defendant's claim of self-defense, is, at minimum, subject to the balancing test set forth in Tennessee Rule of Evidence 403. *See Furlough*, 797 S.W.2d at 650; *see also Jolly*, 1993 WL 523590, at *4; *but compare*, *State v. Ruane*, 912 S.W.2d 766, 779-80 (Tenn. Crim. App. 1995) (suggesting that defendant's desired use of witness testimony to prove first aggression amounts to character evidence of the victim's propensity for violence and is thus subject to evidentiary limitations set forth in Tenn. R. Evid. 404 and 405).

Different admissibility rules apply when testimony is offered to demonstrate the defendant's fear of the victim (i.e., the defendant's mental state) versus when testimony is offered to demonstrate who was the first aggressor. *See Hill*, 885 S.W.2d at 361. In *State v. Jerry Dale Bennett*, this court explained the rules applicable to evidence offered to support a theory of self defense, stating in pertinent part:

> Third persons may testify about violent acts or threats toward them about which the defendant had no knowledge at the time of the offense if the evidence of the victim's violent acts or threats is offered to corroborate a claim of self-defense by proving that the victim was the first aggressor.

1994 WL 53645, at *4 n. 6.

During a jury-out hearing, the defendant presented as an offer of proof the testimony of Lieutenant Hyman that in October of 2005, the victim had been arrested and charged with the unlawful possession of a weapon.

Prior to the offer of proof, the trial court ruled:

> [A]s far as 404(a) and 404(b) are concerned and the testimony that the Defense wishes to elicit by the officer that the victim in this case had been arrested two months prior to his death for unlawful possession of a weapon I don't believe is admissible under Rule 404.
>
> It is not a pertinent character trait that he was arrested once. It's just not admissible under the Rule. I don't see anything admissible under any other Rule.

I think that if he had been charged with a violent act that would be a different situation, but that's not what we have here.

So I'm going to rule that it's not admissible. If you want to make an offer of proof we can go ahead and do that before we bring the jury in.

After the offer of proof, the trial court confirmed its previous ruling noting that the arrest was not a violent act.

The defendant asserts that Lieutenant Hyman's testimony was admissible to show that the victim was the first aggressor. He further argues that the fact that the victim had been arrested on unlawful possession of a weapon supported his theory of self-defense. He asserts that Lieutenant Hyman's testimony was relevant to the defendant's mental state. However, Lieutenant Hyman's testimony was that of a third party. The testimony offered did not concern violent acts or threats toward Lieutenant Hyman and therefore was not relevant to the defendant's theory of self defense. *See Jerry Dale Bennett*, 1994 WL 53645 at *4 n. 6. The trial court aptly noted that the arrest was not an act of violence by the victim. We conclude that the trial court did not abuse its discretion in excluding Lieutenant Hyman's testimony. The defendant is without relief on this issue.

## B. Exclusion of the Statements of Michael Smith

The defendant asserts that the statement of Michael Smith should have been admitted under Rule 804 of the Tennessee Rules of Evidence because Mr. Smith was deceased at the time of trial. The state argues that the trial court did not err in excluding the statements at issue as they were hearsay and outside of any exception.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence." *Anderson v. United States*, 417 U.S. 211, 220 (1974). Hearsay is inadmissible unless it falls under one of the enumerated exceptions to the hearsay rule. *See* Tenn. R. Evid. 802. Those exceptions are defined under Tennessee Rules of Evidence 803 and 804.

The record contains a transcribed statement of Michael Smith dated October 3, 2006. Review of the statement reveals that the statement purports to have been taken by Kelley Bingham Howard, a private investigator employed by defense counsel. In the statement, Mr. Smith confirmed that he knew both the victim and the defendant. He told the private investigator that he came to the crime scene upon hearing shots and saw what he thought might have been a real gun on the ground on the side of the store. According to the statement, Mr. Smith looked again and the gun was no longer where he had seen it. The statement indicated that Mr. Smith said that he assumed that the gun belonged to the victim because it was just lying on the ground. Mr. Smith also stated that he knew that the victim did not like the "CK" tattoo on the defendant's face. He said the victim was known to carry a gun, but that he never heard the victim threaten the defendant. The trial court noted

that the state did not have the opportunity to cross-examine Mr. Smith and excluded Mr. Smith's statement as inadmissible hearsay with no applicable exception. We conclude that the trial court did not err in finding that the statement of Michael Smith was hearsay and that no exception applied to allow the statement into evidence.

Relying on *State v. Brown*, 29 S.W.3d 427 (Tenn. 2000), the defendant asserts that exclusion of Mr. Smith's statement violated his due process rights by depriving him of a defense. He argues that the statement lent credibility to the defendant's claim "that the victim and his cohorts pulled weapons on him at the time he shot the victim." In *Brown*, our supreme court recognized that "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d at 432. The court made clear that "in a particular case, [if] the rule against hearsay operates to deprive a defendant of his or her right to present relevant and reliable evidence that is critical to establish a defense, the rule against hearsay must yield to the defendant's constitutional right to present a defense." *Id.* at 436. In *State v. Kiser*, 284 S.W.3d 227 (Tenn. 2009), our supreme court noted the limits of its previous ruling, stating:

> We also recognized in *Brown*, however, that a defendant's right to present witnesses is not absolute. *Id.* Rather, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S Ct. 1038, 35 L.Ed.2d 297 (1973). And while "the hearsay rule may not be applied mechanistically to defeat the ends of justice," *id.*, it also may not be given short shrift. Rather, any otherwise inadmissible hearsay evidence sought to be admitted on due process grounds must, among other things, bear "sufficient indicia of reliability." *Brown*, 29 S.W.3d at 433-34.

*Id.* at 267.

In our view, Mr. Smith's statement does not demonstrate "sufficient indicia of reliability" to be admitted on due process grounds. *Id.* Mr. Smith told the private investigator that he was not sure that the object that he saw on the ground was a real gun and stated it could have been a BB gun. He said the gun was not close to where the victim was lying and estimated it was five to ten feet from the victim. Mr. Smith also said he assumed that the gun he saw at the crime scene was the victim's because it had been left lying on the ground. Mr. Smith told the private investigator that when he looked again, the gun was gone. We agree with the trial court's finding that the hearsay sought to be introduced by the defense in this case had "no indicia of reliability." Accordingly, we conclude that the trial court's exclusion of the statement did not violate due process. The defendant is not entitled to relief on this issue.

### III. Jury Charge

### A. Jury Charge on Reasonable Doubt

The defendant asserts for the first time on appeal that "[a] new trial should be granted because the jury was given an unconstitutional instruction regarding reasonable doubt." Initially, we note that the defendant failed to contemporaneously object to the instruction or move for a mistrial. *See* Tenn. R. App. P. 36(a). Additionally, the defendant waived any challenge to the jury charge by failing to preserve the issue in his motion for new trial. *See* Tenn. R. App. P. 3(e).

The defendant asserts that this court should review the issue under plain error. *See* Tenn. R. Crim. P. 52(b). He asserts that in *State v. Rimmer*, 250 S.W.3d 12 (Tenn. 2008), "the court discouraged the further use of the instruction that was given in this case." The defendant agues that the trial court's use of the instruction was plain error.

Plain error review extends only to an obvious error which affects the substantial rights of the defendant. The criteria for finding plain error are difficult to satisfy. We will not recognize plain error unless the following five factors are established: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established, and consideration of all five factors is unnecessary if any one factor indicates that relief is not warranted. *Id.* at 283. The defendant has the burden of persuasion regarding plain error claims. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

In *Rimmer*, although the court discouraged use of the instruction at issue, it concluded that the defendant had not demonstrated a reasonable likelihood that the jury applied the burden of proof in an unconstitutional way. *Rimmer,* 250 S.W.3d at 31. In our view the court's determination in *Rimmer* regarding the challenged jury instruction is not sufficient to demonstrate plain error in the instant case. Specifically, we note that the defendant has not shown that a clear and unequivocal rule of law was breached, or that a substantial right of the defendant was adversely affected. Accordingly, the defendant is not entitled to relief on this issue.

B. Jury Charge on Second Degree Murder

The defendant challenges the trial court's charge to the jury as to second degree murder asserting that in instructing the jury on second degree murder, the trial court committed plain error by failing to include the distinction between the *mens rea* of second degree murder and voluntary manslaughter. The defendant asserts that the exclusion of language found in Tennessee Pattern Jury Instruction 7.05 was plain error. He asserts that in charging the jury on second degree murder, the trial court should have included the following language:

> The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The defendant concedes that he did not raise the issue in his motion for a new trial, but asserts that the omission by the court rises to plain error. The defendant, however, fails to provide citation to any supporting authority as to why this matter should not be considered waived. Therefore, the defendant has failed to meet his burden for plain error review. *See State v. Smith*, 24 S.W.3d at 282-83.

Waiver notwithstanding, our review of the trial court's instructions to the jury indicates that the trial court's failure to include language regarding the distinction between second degree murder and voluntary manslaughter in the instruction on second degree murder was not plain error. The trial court sequentially charged the jury with elements of first degree murder and the lesser included offenses. In considering "acquittal-first" instructions, a panel of this court stated:

> The jury does have a duty to determine the grade of the offense, but the "sequential" instruction given to the jury was not violative of this duty under Tennessee law. . . . The sequential jury instruction did not preclude the jury from considering the lesser charges. This is evident from the jury's finding of guilt of second degree murder rather than first degree murder.

*State v. Billie Joe Welsh*, No. E2005-2293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App., at Knoxville, Sept. 26, 2006) *perm. app. denied* (Tenn. Feb. 26, 2007) (quoting *State v. Raines*, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994)). And while "the better practice may be to adhere to the Tennessee Pattern Jury Instruction's approach," this court has affirmed convictions of second degree murder in which the trial court charged the jury with sequential instructions. *See id.* (citing *State v. Earnest Gwen Humphrey*, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App., at Nashville, Aug. 24, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006); *and State v. Walfrido L. Rodriguez,* No. M2005-01351-CCA-R3-CD, 2006 WL 1626845, at *3-4 (Tenn. Crim. App., at Nashville, June 7, 2006) *perm. app. denied* (Tenn. Oct. 30, 2006)). Further, before the jury deliberated, it was instructed as to the elements of the charged offense, the lesser-included offenses and also advised of the law regarding the element of knowing. *See Billie Joe Welsh*, 2006 WL 2737830, at *14; *Walfrido L. Rodriguez*, 2006 WL 1626845, at *4. Accordingly, we conclude that the defendant is without relief on this issue.

Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE